UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| | : MDL NO. 2116 |
| IN RE: APPLE iPHONE 3G AND 3GS "MMS" | : |
| MARKETING AND SALES PRACTICES | : 2:09-md-2116 |
| LITIGATION | : |
| | : |
| THIS MATTER APPLIES TO ALL CASES | : SECTION: J |
| | : |
| | : JUDGE BARBIER |
| | : MAG. JUDGE WILKINSON |

**PLAINTIFFS' MEMORANDUM ON THE
SCOPE, EXTENT, AND TIMING OF DISCOVERY**

NOW INTO COURT, through Plaintiffs' Liaison Counsel and Plaintiffs' Executive

Committee, come the Putative Class Plaintiffs, who file the instant Memorandum on the Scope,

Extent, and Timing of Discovery in accordance with Pre-Trial Order #3. The facts of the case

and the Defendants' statements to this Court support a decision allowing unfettered discovery.

**INTRODUCTION**

The Plaintiffs' claims consolidated in this MDL against AT&T Mobility, LLC ("AT&T")

and Apple, Inc. ("Apple") seek to recover two forms of damages -- both resulting from the lack of

multimedia messaging service ("MMS")[1] functionality on iPhones during the relevant class periods

at issue. MMS generally refers to the ability to send or receive photos or videos to and from

other cell phones via the cell phone's messaging function. As a threshold matter, it is important

---

[1] Plaintiffs acknowledge that it is possible that they may have used verbiage in their complaints that Apple deems inaccurate or non-reflective of precise wording Apple or its employees may have used. For instance, "MMS" is a term of art used in the industry. It is not the name of a product. As a descriptor, it captures many words that Apple may have used to describe it, such as "photos." Plaintiffs understand that Apple or AT&T may not have used the actual term "MMS" in its communications with customers until 2009, but that does not necessarily mean that Defendants did not mislead consumers into believing that the ability to send and receive photos like other cell phones could in 2008.

1

Dockets.Justia.com

to note that MMS is both: (1) a valuable feature to iPhone users for which they paid; and (2) an expensive feature for AT&T to provide on its mobile network.  MMS data exchanges for iPhone users would have severely burdened and jeopardized the quality of AT&T's network.  As a consequence, AT&T chose not to support MMS in breach of its contracts.  This purposeful avoidance constitutes a blatant violation of state consumer protection laws.  Consequently, AT&T and Apple are financially obligated to Class Members for the damages they have caused.

The first form of damages relates to the reduced value of the iPhone device itself – whether purchased from Apple or AT&T.  MMS is an important and valuable component of the iPhone (as well as any phone equipped with a camera and multimedia capacity).  Because Class Members were denied MMS functionality for a portion of the iPhone's useful life, a portion of the value of the device was denied Class Members.

The second form of damages relates to AT&T's unfair and deceptive billing for MMS to its iPhone customers in breach of the monthly service agreement.  Astonishingly, AT&T actually billed iPhone users for MMS without providing the service.  Additionally, the messaging rates charged to Class Members was the identical rate charged to AT&T customers who had other phones for which AT&T had the capacity to provide MMS.  For example, Unlimited Messaging for iPhone customers was billed at $20 (individual) or $30 (family) per month.  This was the same rate charged to other AT&T customers with phones for which AT&T had the capacity to support MMS during the same period.  This is the same rate that AT&T now charges Apple iPhone users for MMS.  The difference is that AT&T iPhone users now have MMS capability.  Therefore, AT&T owes Class Members the portion of the messaging services bill attributable to MMS during the class period.

Plaintiffs have alleged three legal theories:

- *Breach of Contract:* AT&T was contractually obligated to provide MMS. However, AT&T did not provide MMS. Therefore, Plaintiffs and putative Class Members were charged for that service, despite never receiving it during the class period. Apple shares liability for damages because, by virtue of Apple's exclusive bargain with AT&T, Plaintiffs and Class Members could not receive services, including MMS, from other providers.

- *Consumer Protection I (Material Omissions):* Because AT&T's service agreement expressly included the obligation of AT&T to provide MMS, both AT&T and Apple had a duty to adequately disclose that MMS would *not* be provided to iPhone users. Failure to do so constituted a material omission.

- *Consumer Protection II (Affirmative Misrepresentations):* Apple and AT&T affirmatively marketed and advertised the iPhone's MMS functionality without adequate disclosure that such messaging services were not available at the time of purchase.

Apple appears to oppose discovery in this action by focusing solely on one of Plaintiffs' legal theories (affirmative misrepresentations). Apple contends that it can defeat Plaintiffs' affirmative misrepresentation theory with limited, one-way discovery. Apple's argument ignores Plaintiffs' breach of contract and material omission theories. The self serving one-way document production and affidavit process Apple proposes is not permitted by the Federal Rules of Civil Procedure. Discovery should commence now for all facts relevant to Plaintiffs' claims and Apple's defenses in this Action.

AT&T has indicated its intent to file a motion to compel arbitration -- a motion obviously requiring the Court to consider factual matters beyond the pleadings when determining whether such provisions are enforceable (specifically, factual matters regarding the formation of the arbitration provisions and the contracts containing those arbitration/class action ban provisions). The factual analysis regarding the formation of the arbitration provisions and the contracts requires discovery into the purposes for and impact of the arbitration/class action ban provisions.

Apple's attempt to conduct one-way discovery into the merits reveals that Apple cannot prevail on a Rule 12 motion and full discovery should commence now. In the event AT&T files

a motion to compel arbitration to prevent this class action from proceeding, discovery related to the enforceability of the arbitration ban of class actions must also commence. Finally, bifurcation of class and merits discovery is unnecessary, inefficient, and counterproductive. There is no valid reason to delay merits discovery -- particularly where, as here, merits and class certification issues are inextricably intertwined vis-à-vis discovery.

## BACKGROUND

### I.     AT&T's Messaging Packages Include MMS.

On April 25, 2007, AT&T Inc. introduced a plan called "Messaging Unlimited," which gave its customers the ability to send unlimited messages of any type, including text, picture, video, and instant messages to any wireless phone in the U.S. for $19.99 a month. AT&T advertised and represented that its unlimited messaging plan, which it referred to as a "texting plan," included "Text, Picture, Video, and IM." Discovery will disclose whether and to what extent AT&T segregated MMS ("Picture" and "Video") from SMS ("Text") in their messaging plans and to what extent this was reasonably disclosed to Class Members.

### II.    AT&T, Apple's Exclusive Service Provider, Did Not Allow The First iPhones To Send Or Receive MMS.

In January 2007, Apple unveiled the iPhone. This device (iPhone 2G) had many "revolutionary" features not available at the time on other phones. The iPhone 2G initially sold for $499 and $599 (depending upon the amount of memory). However, iPhone purchasers were required to purchase a 2 year exclusive service plan from AT&T.

The iPhone included numerous features upon its release in 2007. However, the 2007 iPhone did not have MMS capability. MMS is one name used to refer to the ability to send photos and videos via a cell phone's text messaging service. According to recently published

AT&T financial results, in the fourth quarter of 2009 alone, over 2 billion picture and video MMS messages were sent over AT&T's network.

From the introduction of the original iPhone 2G in June 2007 until the present, AT&T had the exclusive contract for iPhone service in the United States.  Thus, to lawfully use the iPhone and its accompanying software in the United States, iPhone users must have had a contract with AT&T.

## III.  iPhone 3G Also Lacked MMS Capabilities Despite Class Members Being Charged For MMS.

Since 2007, AT&T had included "Text, Picture, Video, and IM" in its "Unlimited" messaging plans as well as in its definition of "Texting."  AT&T charged $20/month for this "Unlimited" messaging plan to all of its non iPhone customers with MMS capacity as well.  In July 2008, Apple released the iPhone 3G.  One month prior to the release of the 3G, AT&T announced its "iPhone 3G pricing plans," where it stated that "text messaging plans" were available in various packages including a $20/month "Unlimited" individual and $30/month "Unlimited" family plan. Despite the fact that other AT&T customers had MMS capability with their text messaging plans, the iPhone 3G users were unable to send MMS messages in the United States in 2007 and 2008.

## IV.  iPhone's Email Function Is Separate And Distinct From MMS.

Defendants miss the obvious point when they suggest that the MMS promise of communication of pictures and video was satisfied because the iPhone could send and receive photos by *email*.  Text messaging functions by sending messages directly from cell phone to cell phone similar to the way voice communication is transmitted.  E-mail, on the other hand, is a separate function which communicates data from the cell phone to the sender's e-mail provider and then to the receiver's e-mail provider and eventually to the receiver's cell phone.  The email

function requires the iPhone user to purchase an additional data plan (in addition to paying for cell phone service and messaging services) and an existing e-mail account.   Similarly, the recipient cell phone must also be able to receive e-mails.

The distinction between MMS and email is important because MMS does not require a data/internet package.   MMS is paid for by the customers in the same manner as a text message because MMS is a text message. MMS does not require an e-mail or an internet connection. Prior to September 2009, because of the lack of MMS, iPhone users were unable to send photos to phones that did not have internet/e-mail capabilities.

**V.     Apple and AT&T Falsely Promoted The iPhone Version 3.0 Software And The 3GS iPhone Model As Permitting MMS.**

On March 17, 2009, Apple issued a press release relating to an upgrade to the iPhone's operating system software (ver. 3.0), in which it represented that the upgrade would enable both 3G and 3GS models to use "MMS to send and receive photos." On the same date, an Apple Senior Vice President touted the ability of the iPhone to "send and receive photos right over the cell, uh, network." Discovery will reveal that AT&T representatives advised customers that when the 3.0 operating system came out, 3G models would be able to send photos via MMS.   Apple repeatedly referred to MMS functionality with the version 3.0 software as "big news."

On June 9, 2009, Apple advertised MMS with a "3GS Guided Tour" on its official website, including a video tutorial on how users can send photos and videos via MMS.  On June 19, 2009, Apple released the iPhone 3GS. In late June or early July 2009, AT&T began presenting seven foot tall Apple kiosks in its Stores touting the MMS functionality of the iPhone 3GS.  Kiosks in both AT&T and Apple stores represented that the 3G models had MMS capability.  (Exhibit A, manual attachment of video dated August 25, 2009)  On July 21, 2009, during its Q3 Earnings Conference Call with investors, Apple CFO Peter Oppenheimer stated, "Customers are loving the

new iPhone OS 3.0 release which includes more than 100 new features including cut, copy and paste, MM[S], spotlight search, a landscape keyboard for mail, and expanded parental controls for iTunes and App Store contents." As late as August 2009, the packaging materials that came with the iPhone 3G described the availability of MMS.  However, the disclosures did not reveal that MMS would not be available until the fall of 2009.

Although it is undisputed that the iPhone could not perform MMS functions until September 25, 2009, AT&T nevertheless was specifically billing for MMS.  AT&T's messaging service packages included charges for MMS well prior to September 25, 2009.  AT&T offered iPhone customers the same pricing and messaging packages as it did its non-iPhone customers, who paid for and received MMS throughout 2008 and 2009.  AT&T also charged iPhone customers for the same messaging services package prices after MMS became functional for the iPhone on September 25, 2009.  Discovery will reveal that Consumers' invoices clearly indicate that AT&T was charging for MMS functions on the iPhone during the time the iPhone could not support MMS and that AT&T was charging iPhone 3G users for MMS long before the release of the iPhone 3GS in June 2009.

When Apple and AT&T began publishing written and video advertisements expressly promising MMS functionality on 3G models, they initially provided no "late summer" disclosures at all.  Later, public statements by Defendants that MMS functionality would fail until "late summer" were misleading and inadequate.  Discovery will reveal the misleading nature of these disclosures.  For instance, counsel for Plaintiffs have found some evidence of such a disclosure in the context of consumers "troubleshooting" the lack of MMS functionality, *i.e.*, after the purchase of an iPhone had taken place.  The nature and extent of these disclosures will be the subject matter of discovery in this Action.

This case is simple: Defendants' sold a product with knowledge that the product was unable to perform a function that Class members expected and paid for the product to perform. And, AT&T charged customers for the service that it was unable (or unwilling) to provide. Defendants are parties to an exclusive contract to provide iPhone service to customers in the United States. Prior to briefing on substantive legal issues, Putative Class Plaintiffs are entitled to discover the documents regarding the exclusivity relationship of the Defendants. Defendants have made their intention to file "early dispositive motions based on the clear disclosures set forth in their advertisements and materials."[2] The motions contemplated by Defendants require factual inquiries. Plaintiffs should be permitted discovery prior to Defendants filing such dispositive motions.

## ARGUMENT

**I.     Defendants Admit That Discovery Is Necessary, And Discovery Should Commence Now Without Limitation.**

Discovery should commence now. Delaying discovery pending the outcome of a motion to dismiss is the exception rather than the rule. *Glazer's Wholesale Drug. Co., Inc. v. Klein Foods, Inc.*, No. 3-08-CV-0774-L, 2008 WL 2930482, *1 (N.D. Tex. Jul. 23, 2008). "Had the Federal Rules contemplated that a motion to dismiss under Fed. R. Civ. P. 12(b)(6) would stay discovery, they would contain such a provision." *Gray v. First Winthrop Corp.*, 133 F.R.D. 39, 40 (N.D. Cal. 1990).

---

[2] *See* Defendants' Joint Position Statement, p. 5. (Plaintiffs are aware of this Court's statement that the position statements are not binding upon the parties. Plaintiffs cite Defendants' Position Statement for context, as counsel for Apple solidified these positions orally in Court during the status conference of January 15, 2010.) *see also* Transcript of January 15, 2010 Status Conference, pg. 27, wherein counsel for Apple states Apple's intent to file "... simple, limited summary judgment motions."; *see also* Transcript of January 15, 2010 Status Conference, pg. 28 wherein counsel for Apple stated "that there are probably some documents outside the pleadings we would want to introduce.".

In its statement, Apple declared that the basis for its "early dispositive motions" will be "factual," requiring, in its words, "limited discovery." At the initial status conference, counsel for Apple asserted that its initial dispositive motions would thus be more like "summary judgment" motions, focusing on a hyper-technical interpretation of Plaintiffs' use of the term "MMS," promoting an exculpatory discovery process via cherry-picked documents, and misunderstanding the nature of consumer misrepresentation claims.[3]   Apple's view of Plaintiffs' complaints is as parochial as it is legally incorrect.   Apple seizes upon Plaintiffs' use of the term "MMS" as a description of what is at issue in this lawsuit—the ability to send and receive photos to and from other cell phones—and characterizes Plaintiffs' complaints as critique of the nomenclature "MMS." Read this way, Apple surmises, Plaintiffs' complaints can be narrowed in scope because, regardless of how long Apple or AT&T had been telling potential iPhone customers that they would be able to send and receive photos like their friends with less sophisticated phones, Apple perhaps only began using the exact phrase "MMS" in its marketing just before the release of the 3GS in 2009.

Even so, Apple's contention that presenting extrinsic material is necessary even to address what it perceives to be a narrow issue demonstrates that Apple does not believe it can succeed on a motion to dismiss the complaints for failure to state a claim upon which relief can be granted. This foments the question not whether discovery should begin, but what the scope of discovery

_____

[3] Defendants appear to have previewed their argument that their mouse print "disclosure," stating that MMS would not be available until a later time, completely absolves them.  Defendants mistake consumer fraud law with contract law.  Consumer protection law, at its core, prohibits communications that result in confusion.   As such, the nature, placement, and prominence of a "disclosure" are mere factors to consider when determining whether the overwhelming, affirmative misrepresentations caused or were likely to cause confusion.  Furthermore, the applicable contracts create the obligation to provide MMS, require certain iPhone customers to pay for it (*i.e.*, those purchasing messaging plans), and fail to create any caveat that such obligations would be postponed until "late summer."

should be.  Plaintiffs contend that the presentation of documents and affidavits tailored to Apple's claim that certain statements in Plaintiffs' complaints are untrue is unprecedented.  Such a discovery order would result in the presentation of one-sided "facts," guided with the aim of showing only what Apple perceives to be exculpatory documents, without the benefit of Plaintiffs' taking depositions or seeking documents they deem necessary to establish proof of their claims.

The law requires full discovery before any extrinsic material is considered in support of any motion for summary judgment or judgment on the pleadings.  When a court considers matters outside the pleadings in the context of a motion to dismiss under Rule 12, it must convert the motion into one for summary judgment under Rule 56.  Fed. R. Civ. P. 12(d); *Young v. Biggers*, 938 F.2d 565, 568 (5th Cir. 1991); *Mitsui Sumitomo Ins. Co. (H.K.) Ltd. v. P&O Ports Louisiana, Inc.*, No. 07-1538, 2007 WL 2463308, *2 (E.D. La. Aug. 28, 2007); *O'Neal v. Campbell*, No. 5:09CV110, 2009 WL 3489868, *3 (S.D. Miss. Oct. 23, 2009).  Once a motion is treated as one for summary judgment, "All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *Murphy v. Inexco Oil Co.*, 611 F.2d 570, 573 (5th Cir. 1980); *see also Young*, 938 F.2d at 568, 570 (reversing judgment on pleadings where district court considered extrinsic material but where plaintiff asserted he did not have reasonable opportunity to conduct discovery).  Where discovery has not taken place, and where a defendant merely presents cherry-picked documents in support of a motion to dismiss, it is not proper for a court to consider the extrinsic material at all, let alone convert the motion to one for summary judgment.  *Maritrend, Inc. v. Galveston Wharves*, 152 F.R.D. 543, 548 (S.D. Tex. 1993); *O'Neal*, 2009 WL 3489868 at *4.

The court may not consider matters outside the pleadings when only the movant has access to all relevant information relating to extraneous material and the opposing party has not had an opportunity for discovery of the extraneous material. *Lyman v. Board of Educ. Of City of Chicago*, 605 F. Supp. 193, 196 (N.D. Ill. 1985) ("For this Court to grant summary judgment without giving the plaintiff equal access to such information through the process of discovery would be unjust. Summary judgment in favor of the defendants at this point in the proceedings would be to deny the plaintiff her day in court without even according her the benefits of discovery."). Given that Apple has agreed that extrinsic material is necessary to address Plaintiffs' complaints, this Court should order full discovery at this time.

As to AT&T, it is unclear whether Plaintiffs' service provider will move for arbitration or file a motion to dismiss for failure to state a claim. *See* Def. Joint Position Statement, p. 5 (stating "Defendants anticipate that they may have a variety of Rule 9, 12 or other motions. Furthermore, ATTM anticipates filing motions to enforce its arbitration agreements with Plaintiffs. . . . Defendants anticipate filing early dispositive motions based on the clear disclosures set forth in their advertisements and other materials."). Should AT&T, along with Apple, decide to file motions to dismiss under Rule 9 or 12 based on insufficient pleadings, as its Statement suggests through the use of the plural "Defendants," AT&T will have waived arbitration in Plaintiffs' view and discovery of arbitration issues would become moot. *See Republic Ins. Co. v. PAICO Receivables, LLC*, 383 F.3d 341, 344 (5th Cir. 2004) ("Waiver will be found when the party seeking arbitration substantially invokes the judicial process to the detriment or prejudice of the other party."). However, should AT&T move to compel arbitration, discovery will be necessary to determine whether AT&T's mandatory arbitration class action ban provisions are valid, as articulated below.

Finally, whether AT&T succeeds in moving these actions to arbitration, Apple will remain as a Defendant before this Court, and Plaintiffs will seek full discovery from AT&T through third party subpoenas pursuant to Rule 45. Thus, allowing unfettered discovery against both of these Defendants to commence immediately will not result in unnecessary production of documents.

## II.   The Question of Whether AT&T May Seek to Compel Arbitration Can only Be Determined After a Fact-Intensive Inquiry Into the Procedural and Substantive Unconscionability of AT&T's Non-Negotiated Arbitration Provision.

In the Defendants' Joint Position Statement filed with the Court on January 12, 2010, AT&T argued that discovery should not commence "until the Court determines its motions to compel arbitration." (*See* Defendants' Joint Position Statement, p. 5). However, this statement gets the law backwards. Rather, a motion to compel arbitration should be heard after discovery has commenced, so that the Court will have the facts necessary to determine: 1) whether the arbitration clause has been agreed to by class members in general (*i.e.*, what are the common factual circumstances surrounding the execution of the AT&T services agreement), 2) whether there were different versions of the arbitration clause applicable at different times, 3) whether each version is enforceable as a matter of public policy, and 4) whether the arbitration clause unfairly inhibits the right to recovery. All such inquiries are fact-intensive. This Court must undertake a factual analysis to determine whether or not there is a valid agreement to arbitrate. Before this Court can rule on any arbitration motion, the Plaintiffs should be afforded an opportunity to conduct discovery as the Court must undertake a factual analysis to determine whether or not there is a valid agreement to arbitrate.

To determine whether parties should be compelled to arbitrate a dispute, courts perform a two-step inquiry. *Banc One Acceptance Corp. v. Hill,* 367 F.3d 426, 429 (5th Cir. 2004). "First,

the court must determine whether the parties agreed to arbitrate the dispute. Once the court finds that the parties agreed to arbitrate, it must consider whether any federal statute or policy renders the claims non-arbitrable." *Id.* (quoting *R.M. Perez & Assocs., Inc. v. Welch,* 960 F.2d 534, 538 (5th Cir.1992)).

In determining whether an agreement to arbitrate exists, the Court is to apply "ordinary contract principles." *Fleetwood Enters. Inc. v. Gaskamp,* 280 F.3d 1069, 1073 (5th Cir. 2002). In the instant case, the ordinary contract principles analysis further requires a fact-intensive inquiry. Central to the Court's analysis will be determining whether "procedural unconscionability" or "substantive unconsionability" existed. 8 Richard A. Lord, *Williston on Contracts* § 18.10 (4th ed. 1998). To determine whether there was procedural unconscionability, the Court must determine "whether the imposed-upon party had a meaningful choice about whether and how to enter into the transaction," whereas the determination of substantive unconscionability results from answering whether the "terms are unreasonably favorable," whether they "impair the integrity of the bargaining process or otherwise contravene the public interest or public policy." *Id.* Such unconscionability determinations are, by definition "fact-sensitive." *Forsythe v. BancBoston Mortgage Corp.*, 135 F.3d 1069, 1074 (6th Cir. 1997).

Indeed, courts routinely conduct factual inquiries when deciding the question of unconscionability. *See, e.g., Ting v. AT&T*, 182 F. Supp. 2d 902, 934 (N.D. Cal. 2002) (the court determined substantive unconscionability of an arbitration clause based on plaintiffs' "substantial evidence of the costs of arbitration, much of it gleaned from discovery obtained from AAA . . . "), *aff'd in part, rev'd in part, Ting v. AT&T*, 319 F.3d 1126 (9th Cir. 2003); *Trujillo v. Apple Computer, Inc.*, 578 F. Supp. 2d 979, 992-95 (N.D. Ill. 2008) (after fact intensive analysis, court

denied AT&T motion to compel arbitration based on procedural unconscionability alone, finding

that arbitration agreement was not available to plaintiff prior to or at time of iPhone purchase).

Specifically, courts consider the unconscionability of an arbitration clause by examining

evidence that the clause blocks individuals from pursuing legal rights.  Thus, in *Coneff v. AT&T*

*Corp.*, 620 F. Supp. 2d 1248, 1257-58 (W.D. Wash. 2009), the court, in determining whether

AT&T Wireless's arbitration clause was unconscionable (including attorney fee award),

considered the amounts of potential recovery, expert testimony, declarations of consumer

attorneys nationwide regarding the impracticality of individual arbitrations against large

corporations for small amounts, and evidence that the number of consumer arbitrations involving

defendants was low, as compared to number of consumer complaints lodged with non-profit

consumer organization. [4]  *See also*, *Dale v. Comcast Corp.*, 498 F.3d 1216 (11th Cir. 2007)

(holding that determination of substantive unconscionability requires factual comparison of

amounts of potential, individual recoveries to cost of vindicating and individual consumer's

claim).

The "arbitration clause" at issue in the AT&T contract is essentially an anti-class action

clause.  In *Green Tree*, the United States Supreme Court noted that under circumstances where

the pursuit of individual actions in arbitration would prove prohibitively expensive, an arbitration

provision which precluded class action treatment of claims would be violative of claimants' due

---

[4] It should be noted that AT&T's arbitration clause has been held unenforceable for multiple reasons in the context of other putative class action cases.  *See Laster v. AT&T Mobility LLC*, 584 F.3d 849, 856 (9th Cir. 2009) (despite presence of clause awarding individual consumer $7,500 premium payment and "double attorney's fees in the event the arbitrator awards the customer more than AT&T's last written settlement offer before the arbitrator was selected," court held that AT&T's arbitration clause was substantively unconscionable as an exculpatory clause in part because aggrieved customers will not file claims); *Trujillo*, 578 F. Supp. 2d at 995 (AT&T motion to compel arbitration denied based on procedural unconscionability in context of iPhone sales).

process rights.  Putative Class Plaintiffs assert that the anti-class action arbitration clause *sub judice* is violative of Plaintiffs' due process rights as a matter of federal law.  *See e.g. Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 92, (2000); *In re American Express Merchants' Association*, 554 F.3d 300 (2d Cir. 2009); *Primerica Life Ins. Co. v. Brown*, 304 F.3d 469, 471, n. 1 (5th Cir. 2002) (*citing Green Tree*).

Notably, in *Green Tree,* the Supreme Court held that the burden to show that an anti-class action provision would deprive plaintiffs' of a cause of action rested with the plaintiffs. *Green Tree*, 531 U.S. at 91-92.  In *American Express*, *supra*, following *Green Tree*, the Second Circuit found that an anti-class action provision was violation of federal due process rights only after an extensive evidentiary showing as to the nature of plaintiffs' claim demonstrated that depriving plaintiffs of the right to class action would effectively deprive plaintiffs of the ability to pursue their claims.  *American Express*, 554 F.3d at 320. Accordingly, in order to determine whether the instant anti-class action arbitration clause is unenforceable as a matter of federal due process law, Putative Class Plaintiffs must engage in much of the same discovery necessary to consideration of the class certification question (see discussion, *infra*).

An inquiry into the enforceability of the agreements and/or the anti-class action arbitration clauses cannot be made until the facts concerning the formation of each agreement are discovered.  Therefore, Putative Class Plaintiffs respectfully request that the Court order discovery on the facts surrounding the enforceability of the ban of class actions/arbitration provision prior to AT&T's moving to compel arbitration.  For example, the following categories of information will be sought by Plaintiffs in this regard:

- Exemplars of all versions and drafts of all documents AT&T contends require arbitration of the disputes in this class action.

- The planning and implementation of AT&T's arbitration provisions and programs.

- The reasons for the class action bans contained in AT&T's arbitration provisions.

- The arguments and legal rationale advanced by AT&T in other cases challenging the enforceability of the arbitration and anti-class action provisions.

- Any arbitrations initiated by AT&T against its customers or any arbitrations initiated by customers against AT&T including the subject matter, forum, procedures, costs, number and outcome of any such arbitrations.

These categories fit within the jurisprudential framework of allowing inquiry into factual issues bearing on the making of the arbitration agreement that is needed to determine whether the parties agreed to arbitrate.

## III.   This Court Should Not Bifurcate Discovery Because The Facts Related To Class Certification Are Intertwined With The Merits.

The Manual for Complex Litigation[5] recognizes that there is not a bright line between class and merits types of discovery.  In cases without bright lines between merits discovery and class discovery, courts tend not to bifurcate discovery and instead allow merits discovery to proceed at the outset.  "Arbitrary insistence on the merits/class discovery distinction sometimes thwarts the informed judicial assessment that current class certification practice emphasizes." MCL 4th, § 21.14.  Because there is no practical distinction in the instant case between merits discovery and class discovery, the Court should not bifurcate discovery.

### A.      Due to the Commonality of Factual Issues in This Case, There Would Be No Practical Benefit to Discovery Bifurcation.

In similar cases, courts have found the overwhelming overlap of information swallows the well-intended efficiencies of creating separate discovery tracks.  This is due to the fact that, where there are common facts supporting all class members' claims, issues of class certification and the merits of the case are closely intertwined.  *See Blades v. Monsanto Co.*, 400 F.3d 562,

---

[5] David F. Herr, Manual for Complex Litigation (4th ed. 2009) ("MCL 4th").

567 (8th Cir. 2005) ("The preliminary inquiry at the class certification stage may require the court to resolve disputes going to the factual setting of the case, and such disputes may overlap the merits of the case."); *Hudson v. Delta Air Lines, Inc.*, 90 F.3d 451, 457 (11th Cir. 1996) ("[E]vidence relevant to the commonality requirement is often intertwined with the merits."); *Gray v. First Winthrop Corporation*, 133 F.R.D. 39, 41 (N.D. Cal. 1990) ("Discovery relating to class certification is closely enmeshed with merits discovery, and in fact cannot be meaningfully developed without inquiry into the basic issues of the litigation.") (citing Manual For Complex Litigation (Second) § 30.12 (1985))[6]; *Yaffe v. Powers*, 454 F.2d 1362, 1367 (1st Cir. 1971) (ordering the district court to allow plaintiffs to conduct discovery into an allegedly common practice by defendants as to the class in order to support a motion for class certification); *Impact, LLC v. United Rentals, Inc.*, No. 4:08CV00430, 2009 WL 413713, *3-7 (E.D. Ark. 2009) (ordering broad discovery during class discovery phase of bifurcated discovery); *Rakes v. Life Investors Insurance Co. of America*, No. C06-0099, 2008 WL 429060, at *1 (N.D. Iowa 2008) (ordering production of documents related to plaintiffs' allegations of "a hidden plan and intent to shift the risk of faulty actuarial assumptions onto policyholders through future rate increases on a nationwide basis" during class discovery phase).

Thus, Courts must consider the degree to which the certification evidence is closely intertwined with, and indistinguishable from, the merits evidence in determining whether bifurcation is appropriate. *In re Rail Freight Fuel Surcharge Anti-Trust Litigation*, 258 F.R.D. 167, 173 (D.D.C. 2009) (citing *Cima v. WellPoint Health Networks, Inc.,* No. 05-CV-4127, 2008

---

[6] Section 30.12 of the Manual for Complex Litigation, Third Edition ("MCL, Third") provides that "[d]iscovery relating to class issues may overlap substantially with merits discovery. A key question in class certification may be the similarity or dissimilarity between the claims of the representative parties and those of the class members-an inquiry that may require discovery on the merits and development of basis issues." *Id.* at pp. 215-16.

WL 746916, at *4 (S.D. Ill. 2008)).  When certification evidence and merits evidence are closely intertwined, it is not proper to bifurcate discovery.  *See In re Plastics Additives Antitrust Litig.*, 2004 WL 2743591 (citing *Gray v. First Winthrop Corp.*, 133 F.R.D. 39 (N.D. Cal. 1990)).

It should be noted that where, as here, class certification questions overlap with merits questions, the need to develop a full factual record on class certification questions is in no way lessened.  *See Oscar Private Equity Investments v. Allegiance Telecom, Inc.*, 487 F.3d 261, 268 (5th Cir. 2007), citing *Miles v. Merrill Lynch (In Re: IPO)*, 471 F.3d 24 (2d Cir. 2006).  The *In re IPO* court held that, even where doing so requires a determination of a merits question, the Court is obligated to make a factual findings as to class certification elements from the record. In light of this requirement, the Court should not hamstring the Plaintiffs in obtaining merits discovery necessary to resolve the class certification question**.**

In *In re Rail Freight Fuel Surcharge Antitrust*, the court ordered an initial period of discovery prior to briefing on class certification and concluded:

> I want to allow plaintiffs to make their case for certification using the evidence and arguments that they consider to be the most appropriate and not to be limited to the information that defendants or the Court might have chosen. I find this a preferable solution to attempting to *define the ineffable* by attempting to identify in advance what ESI will bear on the certification issue and not the merits and what I view as the *unacceptable solution* of limiting plaintiffs to the information defendants deem relevant to the certification issue.

258 F.R.D. at 176 (emphasis added).  Plaintiffs in this case wish to avoid the practice of establishing a bifurcated "class" discovery window with the intention of creating a streamlined path to class certification proceedings, only to see that process bogged down by a series of discovery disputes over what constitutes "class" discovery, particularly when it is the experience of most judges and class counsel that there is overwhelming overlap between class and merits facts.

In the instant case, the merits discovery and class certification discovery are very closely intertwined. The following categories will be relevant to both class certification issues and merits issues.

- The facts and circumstances surrounding the agreement between Apple and AT&T which made AT&T the exclusive carrier for the iPhone in the United States.

- Representations concerning the availability or functioning of MMS on the iPhone by Defendants either directly through documents provided to purchasers or through statements, announcements, marketing, and advertisements.

- Internal communications among and between Defendants concerning the availability and functioning of MMS on the iPhone on AT&T's network.

- The facts and circumstances surrounding any disclosures made by Defendants that the MMS feature on the iPhone would not function on the AT&T network until a specified point.

- Financial information regarding the sale of various versions of the iPhone and the AT&T voice and data plans for the iPhone.

Even a cursory review of these subject matters will reveal to the Court that attempting to separate discovery into two phases will create unnecessary work for the Court and a duplication of discovery efforts without any concomitant efficiencies. For instance, when Defendants produce their marketing materials and sales representative training materials and scripts, these will show both 1) whether Defendants mislead customers as to the photo-sharing abilities of the iPhone and 2) whether such misrepresentations present common predominating issues. Exemplars of contracts and discovery of contract-execution procedures are relevant to: class certification (to establish commonality to class members and/or member of subclasses), choice of law determinations, and merits issues related to Plaintiffs' breach of contract claims. Discovery regarding why the iPhone was denied multimedia messaging capacity on AT&T's network will clearly be relevant to the merits of the action, but may also establish how this lack of

functionality uniformly impacted putative Class Members as a whole.  The list goes on, and so do the endless overlap of factual issues.

### B.  Even If Some Limitation on Discovery Is Considered, This Court Should Rule Out Objections Based on Arguments That Such Facts Are Related to the Merits of the Litigation.

As a threshold matter, the Court need not burden itself with the task of micromanaging disputes arising out of separated class versus merits discovery tracks.  Bifurcated discovery fails to promote judicial economy when it requires "ongoing supervision of discovery." *Gray v. First Winthrop Corp.* 133 F.R.D. 39, 41 (N.D. Cal. 1990).  If this Court were to bifurcate discovery, it would have to resolve various, needless disputes that would arise concerning the classification of each document and response as "merits" or "certification" discovery. *See In re Rail Freight Fuel Surcharge Anti-Trust Litig.*, 258 F.R.D. 167 (D.D.C. 2009); *In re Urethane Antitrust Litig.*, 237 F.R.D. 454, 459 (D. Kan. 2006).  Thus, even if the Court chooses to adopt a dual class/merits discovery track, Plaintiffs requests that the Court head off potential disputes at the pass, ordering that information sought is not objectionable as merits-related, as long as it is potentially relevant to class certification.  In proposing bifurcated discovery, Defendants hope to *bar* any discovery if it approaches the merits of the claims, regardless of whether it would also be relevant to class certification.  No court has agreed with this position.  Discovery that straddles both class and merits must be produced in the class stage.  *See*, *e.g.*, *In re Ins. Premium Local Tax Litig.*, 2008 WL 544474, *5-6 (E.D. Ky. Feb. 25, 2008) (even where class/merits discovery was bifurcated, court yet determined, "[T]he fact that discovery may be relevant to the merits of plaintiffs' underlying claims as well as to class certification issues does not, standing alone, require denial of plaintiffs' motion [to compel names of class members]," and held production was "not wholly irrelevant" in determining number of policies alleged to suffer from similar defects in premium

charges, not just number of policies written); *Ho v. Ernst & Young*, 2007 WL 1394007, *1-2 (N.D. Cal. May 9, 2007) (holding that in class certification discovery stage, production was appropriate where information relevant to both class and merits).  In *Ho v. Ernst & Young*, the plaintiff claimed that he had been improperly treated as a "professional" exempt from California's overtime laws, and as such was owed money on an hourly basis.  In discovery, plaintiff sought production of defendant's electronic time and activity records for the putative class members. Defendant objected, in part based upon a claim that the information sought by the plaintiff would help establish the merits of plaintiffs' claims and as such was premature.  The Court summarily rejected this claim, holding: "This argument is unfounded, because discovery can certainly be relevant both to class certification issues and to the merits." 2007 WL 1394007, *1 (N.D. Cal. May 9, 2007). *See also Haus v. City of New York*, 2006 WL 3375395, *4 (S.D.N.Y. Nov. 17, 2006) (describing as "without merit" defendants contention that information relevant for merits was not discoverable when also having dual relevance for class certification issues).

IV.    **Should the Court Disagree with Plaintiffs' Position; the Plaintiffs Are Entitled to Rule 26 Disclosures.**

A Preliminary Conference Notice has not yet been sent out by this Honorable Court.  If and when a Preliminary Conference Notice is sent, the parties will meet pursuant to Local Rule 26.4 and will make Rule 26(a)(1) disclosures.  Respectfully, the Putative Class Plaintiffs must be afforded the opportunity to review the documents disclosed in the Rule 26(a)(1) disclosures prior to this Court hearing any early dispositive motions based on any legal theory.  Thus, should this Court not agree with the Putative Class Plaintiffs' position on discovery, Putative Class Plaintiffs ask that this Court set a deadline for Rule 26(a)(1) disclosures.

## CONCLUSION

This Court should not bifurcate discovery. Any bifurcation between "class" and "merits" issues will place an unnecessary burden on the Court to micromanage discovery disputes without any concomitant efficiencies by the parties. The substantial overlap of factual issues relating to class certification and merits in this case weighs in favor of discovery proceeding without any such artificial divisions. Therefore, Plaintiffs respectfully request that this Honorable Court order that full discovery with regard to both Defendants immediately commence. However, if AT&T moves to compel arbitration, Plaintiffs respectfully request that discovery involving Apple should proceed in full.

Furthermore, discovery with respect to AT&T should be ordered with regard to the validity of its mandatory arbitration clause and class action ban provision.

Respectfully submitted:

/s/ *SCOTT R. BICKFORD*
SCOTT R. BICKFORD (1165)
Martzell & Bickford
338 Lafayette St.
New Orleans, LA 70130
Telephone:      504/581-9065
Facsimile:      504/581-7636
usdcedla@mbfirm.com

**John R. Climaco**
CLIMACO, LEFKOWITZ, PECA, WILCOX &
GAROFOLI CO. LPA
55 Public Square
Suite 1950
Cleveland, OH 44113
Telephone:      (216) 621-8484
Facsimile:      (216) 771-1632

**Stephen B. Murray, Sr.**
MURRAY LAW FIRM
650 Poydras Street, Suite 1100
New Orleans, Louisiana 70130
Telephone:     504.525.8100
Facsimile:     504.584.5249

**Ronnie G. Penton**
Law Offices of RONNIE G. PENTON
209 Hoppen Place
Bogalusa, LA 70427
Telephone:     985/732-5651
Facsimile:     985/735-5579