UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
|  | : | MDL NO. 2116 |
| IN RE: APPLE iPHONE 3G AND 3GS "MMS" | : |  |
| MARKETING AND SALES PRACTICES | : | SECTION: J |
| LITIGATION | : |  |
|  | : | JUDGE BARBIER |
| THIS DOCUMENT RELATES TO ALL CASES | : | MAG. JUDGE WILKINSON |

.. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. ..

ORDER AND REASONS

Before the Court are Apple Inc.'s Motion to Compel Arbitration (Rec. Doc. 235; see also Rec. Docs. 267, 288) and Motion to Dismiss under Rule 12(b)(7) (Rec. Doc. 268; see also Rec. Doc. 275), as well as Plaintiffs' memoranda in opposition to same (Rec. Docs. 264 (re Motion to Compel Arbitration), 277 (same), 286 (same), 271 (re Motion to Dismiss)). Having considered the arguments of counsel, the record, and the applicable law, the Court finds as follows:

## I. BACKGROUND AND PROCEDURAL HISTORY

This Multidistrict Litigation ("MDL") consists of twenty-three putative class actions consolidated before this Court pursuant to 28 U.S.C. § 1407. Plaintiffs are purchasers of the iPhone 3G or 3GS cellular telephone and subscribers to wireless service from AT&T Mobility, L.L.C. ("AT&T") between July 11, 2008 and September 25, 2009. Apple Inc. ("Apple") is the manufacturer of the iPhone and Defendant/Mover herein. AT&T also was named as a defendant, but was voluntarily dismissed by Plaintiffs on November 21, 2011.

The iPhone combines a number of electronic devices—a

telephone, a camera, an internet communication device, a digital music player, etc.—into a single handheld product.  On July 11, 2008 (the start of the putative class period), Apple introduced the iPhone 3G, its second model iPhone (the first model iPhone, the iPhone 2G, was discontinued in June 2008).  On June 19, 2009, Apple introduced its third model iPhone, the iPhone 3GS.  At the end of the putative class period, September 25, 2009, both the 3G and 3GS models were available for purchase.

This dispute concerns Multimedia Messaging Service ("MMS"), one feature of the 3G and 3GS iPhones.  MMS allows the user to quickly send pictures or videos from the phone without being connected to the Internet.  This is in contrast to Short Messaging Service ("SMS"), which permits users to send text-only messages from one phone to another.  SMS and MMS require a wireless network in order to function.  Although SMS was always available on all model iPhones, MMS did not become a functional feature on the 3G and 3GS iPhones until September 25, 2009 (MMS was never available on the iPhone 2G).

Plaintiffs allege that, prior to and during the relevant time period, "Apple and AT&T co-marketed the iPhone with AT&T's wireless network service."  (Am. Compl. ¶¶ 2, 22, Rec. Doc. 71).[1]  That is, one could purchase an iPhone from either Apple or AT&T, but due to

---

[1] Separate complaints were filed for each member case consolidated with this MDL.  However, the Court adopts the parties' practice of referencing the First Amended and Supplemental "Carbine" Complaint (Rec. Doc. 71) as representative of the other complaints.

an "exclusivity agreement" between Apple and AT&T, the iPhone could only be used with AT&T's wireless service network. (Id. ¶¶ 2, 53, 82).  To gain access to AT&T's network (which was necessary to use the MMS feature), iPhone purchasers had to enter into AT&T's Wireless Services Agreement ("WSA").  (Id. ¶¶ 2, 53, 82).  The WSA contained a clause requiring disputes to be resolved by arbitration on an individual basis (i.e., class actions and class arbitration are prohibited).  (See Decl. of Richard Rives, Ex. 1, pp. 13-17, Rec. Doc. 117-1 at 16-20).

Plaintiffs claim that AT&T "promoted and sold unlimited texting plans to all [of] it[s] customers," and represented that such plans "'included text, picture, video and IM.'" (Id. ¶ 7 (emphasis omitted)).  Plaintiffs also allege that

> as the Defendants were about to launch the 3G phone, a grave complication developed.  Sending pictures by text took considerably more capacity than sending a written text message, and AT&T realized that its entire network would be overloaded if millions of new iPhone users began texting pictures on the 3G iPhone.

(Id. ¶ 4).  "AT&T's network was unable to provide the service of texting pictures [i.e., MMS] until it upgraded its network . . . ." (Id. ¶ 6).  Thus, Plaintiffs claim that "AT&T intentionally barred iPhone users from having [MMS], but continued to charge the consumers for that service and represented to the iPhone users that the service included pictures."  (Id. ¶ 7; see also id. ¶ 58).

As to Apple, Plaintiffs do not allege that the unavailability of MMS was due to any defect in the iPhone. (See id. ¶¶ 4, 5, 6, 7,

51, 75, 78, 86, 88, 112 (claiming that AT&T's network initially could not accommodate MMS). Instead, Plaintiffs allege that Apple "never disclosed to consumers that they had to pay for . . . picture messaging under the unlimited plans for their exclusive provider, AT&T, even though they would not have that service." (Id. ¶ 8). Also, "Apple made affirmative representations that such a service was available, including large in-store videos showing people texting pictures with small, fine print disclosures about when the service was available, intentionally designed so that consumers would not see or understand them." (Id.).

    In December of 2009, the Judicial Panel on Multidistrict Litigation transferred the first wave of cases comprising this MDL. In August of 2010, after amended complaints were filed in sixteen of the then-existing cases, AT&T moved to compel Plaintiffs to arbitration based on the arbitration clause and class action waiver found in its WSA (Rec. Docs. 95-111). AT&T alternatively moved at that time to dismiss the claims under Rule 12(b)(6) (Rec. Docs. 138-154). Concurrently, Apple moved to dismiss under Rule 12(b)(6), arguing that it never represented that MMS was available on the iPhone 3G, and all advertisements for the 3GS contained disclaimers stating that MMS would not be available until late summer 2009. (Rec. Docs. 120-135). In November of 2010, before briefing on these motions was complete, the Court stayed proceedings pending the Supreme Court's resolution of AT&T Mobility

LLC v. Concepcion, __ U.S. __, 131 S. Ct. 1740, 1746 (2011). At issue in Concepcion was whether the Federal Arbitration Act ("FAA") preempted the "Discover Bank rule," a judicially-created state law that classified most class action waivers in consumer arbitration agreements as unconscionable. Notably, the arbitration clause in Concepcion was nearly identical to those found in AT&T's WSAs. Compare Decl. of Richard Rives, Ex. 1, pp. 13-17, Rec. Doc. 117-1 at 16-20, with Concepcion, 131 S. Ct. at 1744.

Concepcion was decided in April of 2011 and held that the Discover Bank rule was preempted by the FAA. In October of 2011, after the stay was lifted in this MDL and pursuant to a revised briefing schedule, both AT&T and Apple moved to compel arbitration. (Rec. Docs. 235-259). In November of 2011, Plaintiffs voluntarily dismissed their claims against AT&T, tacitly acknowledging that their opposition to AT&T's Motion to Compel Arbitration could not succeed after Concepcion.[2] (Rec. Doc. 262). However, Plaintiffs

---

[2] At oral argument, counsel for the Plaintiffs admitted that Concepcion resolved the arbitration issue in AT&T's favor:

THE COURT: Let me ask you this: What was the intended purpose--I'm trying to figure out the maneuver of dismissing AT&T all of a sudden. I'm assuming that the plaintiffs concluded that you would be forced to arbitrate your claims against AT&T under Concepcion?

[PLAINTIFFS' COUNSEL]: That's correct.

THE COURT: I can't really figure any other reason why you would dismiss them.

[PLAINTIFFS' COUNSEL]:Absolutely. We figured that Your Honor would grant that under Concepcion because it involved the same arbitration clause and that arbitration clause has a ban on class actions. What it means is that no plaintiff will have a claim against AT&T. No one is going to arbitrate for $20 or $50 or whatever the claim is.

did not dismiss their claims against Apple, and opposed Apple's Motion to Compel Arbitration.  (Rec. Docs. 264, 277, 286).  Apple subsequently filed a Motion to Dismiss under Rule 12(b)(7), arguing that the case could not proceed without AT&T.  (Rec. Doc. 268). Another round of briefing ensued (Rec. Docs. 271, 275), oral argument was held, and now both Apple's Motion to Compel Arbitration and Motion to Dismiss are ripe for resolution.

## II.  <u>DISCUSSION</u>

### A.   Dismissal under Rule 12(b)(7) and Rule 19

Apple argues in its Motion to Dismiss that this case cannot proceed without AT&T, because Plaintiffs' claims require litigating the meaning of AT&T's WSA and determining whether AT&T breached the terms of that agreement.  Plaintiffs counter that their theories of liability are not predicated on the WSA's contents, nor do they require interpretation of the WAS or proving breach by AT&T.

These issues overlap considerably, if not entirely, with the issues surrounding Apple's Motion to Compel Arbitration, discussed below.  Because resolution of the Motion to Compel is dispositive of the Motion to Dismiss, the Motion to Dismiss is discussed only briefly.

The Fifth Circuit has explained:

Rule 12(b)(7) allows dismissal for "failure to join a

---

(Tr. p. 37, Rec. Doc. 281 at 37).

> party under Rule 19." Rule 19 provides for the joinder of all parties whose presence in a lawsuit is required for the fair and complete resolution of the dispute at issue. It further provides for the dismissal of litigation that should not proceed in the absence of parties that cannot be joined.

HS Resources v. Wingate, 327 F.3d 432, 438 (5th Cir. 2003) (footnotes omitted).

Analysis under Rule 19 involves multiple steps. First, a court must determine whether a party is "required" or "necessary" under Rule 19(a). A party is necessary if:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
>
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>
>> (i) as a practical matter impair or impede the person's ability to protect the interest; or
>>
>> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. Proc. 19(a). Necessary parties must be joined in the action unless joinder is not feasible; i.e., the party is not subject to service of process, joinder would deprive the court of subject matter jurisdiction, or joinder would make venue improper. Fed. R. Civ. Proc. 19(a)(1),(2); 7 Charles Alan Wright, et al., Federal Practice and Procedure § 1604, at 40 (3d ed. 2001). If joinder is not feasible, then under Rule 19(b), it must be determined whether, "in equity and good conscience, the action should proceed among the existing parties or should be dismissed."

Rule 19(b) provides several factors to consider.

Where interpretation of a contract is at issue, the parties to the contract are necessary parties.  See Sch. Dist. of Pontiac v. Sec'y of U.S. Dep't of Educ., 584 F.3d 253, 303 (6th Cir. 2009); Siemens Bldg. Techs., Inc. v. Jefferson Parish, No. 03-2272, 2004 WL 1837386 at *6 (E.D. La. Aug. 16, 2004); see also Envirotech Corp. v. Bethlehem Steel Corp., 729 F.2d 70, 75 (2d Cir. 1984) (affirming district court's conclusion that a non-party was an indispensable party under Rule 19(b) where it "possessed rights arising from the agreements at issue which are inextricably intertwined with issues bound to be raised in an action solely against" the named defendant (internal quotations omitted)).  For reasons discussed in Part C, below, Plaintiffs' claims require interpretation of AT&T's WSA.  Accordingly, AT&T is a necessary party under Rule 19(a).  See also In re Apple iPhone 3G Prod. Liab. Lit., No. 09-2045, 2011 WL 6019217 (N.D. Cal. Dec. 1, 2011), discussed infra note 5.

Because joinder of AT&T clearly was feasible before Plaintiffs voluntarily dismissed it, there is no need to engage in analysis under Rule 19(b).  See id. at *4.  Normally, the Court would simply order that AT&T be joined.  However, given that AT&T moved twice to compel arbitration prior to its dismissal, and Plaintiffs' admission that Concepcion requires their claims against AT&T to be arbitrated, see note 2, supra, joinder of AT&T would be inefficient

for both the Court and the parties.  AT&T presumably would move to compel arbitration again, which would likely be granted, and the case would be right where it is now: with Apple's Motion to Compel Arbitration pending.  Furthermore, because the Court ultimately concludes that Apple's Motion to Compel Arbitration should be granted, as explained in Part C, below, the Motion to Dismiss becomes moot.

**B.  Waiver**

Turning to Apple's Motion to Compel Arbitration, Plaintiffs argue that Apple has waived any right it may have to compel arbitration.

"The right to arbitrate a dispute, like all contract rights, is subject to waiver." Nicholas v. KBR, Inc., 565 F.3d 904, 907 (5th Cir. 2009) (citation omitted).  However, there is a strong presumption against finding waiver, and the party asserting waiver bears a heavy burden. In re Mirant, 613 F.3d 584, 588 (5th Cir. 2010) (citing Republic Ins. Co. v. PAICO Receivables, LLC, 383 F.3d 341, 344 (5th Cir.2004)).  Whether waiver occurred depends on the facts of each case; there is no bright line rule.  Id. at 589 (citing Tenneco Resins, Inc. v. Davy Int'l, AG, 770 F.2d 416, 420 (5th Cir.1985)).  A party asserting waiver must show (1) that the other party has substantially invoked the judicial process and (2) permitting arbitration will cause prejudice, id. at 591 (citing Nicholas, 565 F.3d at 910), though there may be some overlap

between these prongs, <u>see Petroleum Pipe Am. Corp. v. Jindal Saw, Ltd.</u>, 575 F.3d 476, 480 n.2 (5th Cir. 2009) (citing <u>Price v. Drexel Burnham Lambert, Inc.</u>, 791 F.2d 1156, 1158 (5th Cir. 1986)).

Plaintiffs contend that Apple substantially invoked the judicial process when it filed Rule 12(b)(6) Motions to Dismiss in 2010—before proceedings were stayed pending the <u>Concepcion</u> decision—thereby seeking to eliminate Plaintiffs' claims on their merits. Plaintiffs note that Apple's Motion to Compel Arbitration was not filed until a year later. Plaintiffs contrast Apple with AT&T, which, in 2010, simultaneously moved to compel arbitration and to dismiss under Rule 12(b)(6). As to the prejudice prong, Plaintiffs argue Apple's delay in moving for arbitration caused their attorneys to spend significant time responding to Apple's Motions to Dismiss, and Plaintiffs have not been able to engage in discovery pending resolution of same.

The Court finds Apple has not waived its arbitration argument for several reasons. First, prior to the Supreme Court's decision in <u>Concepcion</u>, Apple's Motion to Compel would have been futile as to the member cases transferred from districts that followed <u>Discover Bank</u> or an analogous rule. Courts have declined to find waiver when moving for arbitration would have been a futile act. <u>See Letizia v. Prudential Bache Securities, Inc.</u>, 802 F.2d 1185, 1187 (9th Cir. 1986); <u>see also In re Apple & AT&TM Antitrust Litig.</u>, __ F. Supp. 2d __, 2011 WL 6018401 at *3 & n.12 (N.D. Cal.

Dec. 1, 2011) (holding defendant's failure to appeal from denial of motion to compel arbitration in 2008 did not preclude it from re-asserting the motion in 2011, given that any appeal would have been futile prior to Concepcion); Brown v. Trueblue, Inc., No. 10-514, 2011 U.S. Dist. LEXIS 134523 (M.D. Pa. Nov. 22, 2011) (fifteen months into litigation, defendants did not waive rights by waiting until after Concepcion to seek arbitration, even though they answered, the parties engaged in discovery, and the parties fully briefed the class certification issue).

Second, although Apple moved in 2010 to dismiss many of the Complaints under Rule 12(b)(6), the Court has not ruled on those Motions, and in fact, stayed this case before briefing was complete and submitted for decision.  Thus, this case is distinguishable from In re Mirant and similar cases where a defendant moved to compel arbitration after the district court ruled on (and partially denied) its motion to dismiss.  613 F.3d at 590.  The defendant in In re Mirant was found to have substantially invoked the judicial process, because holding otherwise would have allowed it to ascertain how the case was proceeding in court before seeking arbitration.  That concern is not present here, given that Apple's 12(b)(6) Motions were not submitted for decision and no decision was rendered.  Furthermore, despite the fact that this case is over two years old, this litigation is still in its early stages:  No answers have been filed and the only discovery that has occurred

concerned AT&T's Motion to Compel Arbitration.

Third, and most importantly, even if Apple's Motions to Dismiss were deemed a substantial invocation of the judicial process, Plaintiffs still have not shown that Apple's delay caused them prejudice.  See In re Mirant, 613 F.3d at 591 ("**In addition to** invocation of the judicial process, the party opposing arbitration **must** demonstrate prejudice before we will find a waiver of the right to arbitrate." (emphasis added, quotations and citation omitted)). "'Prejudice in the context of arbitration waiver refers to delay, expense, and damage to a party's legal position.'"  Id. (quoting Nicholas, 565 F.3d at 910).   AT&T moved to compel arbitration on August 10, 2010.   That Motion, like Apple's Rule 12(b)(6) Motions, was stayed in November 2010 pending Concepcion. Thus, even if Apple had filed a Motion to Compel Arbitration in 2010 when AT&T did, Apple's Motion still would have been stayed in November 2010, and Apple would have had to re-file its Motion to Compel in 2011 (as occurred with AT&T).   In other words, Apple's failure to file a Motion to Compel Arbitration in 2010 did not delay this MDL.

Plaintiffs argue that Apple's Motions to Dismiss prevented them from conducting discovery until that Motion was resolved. However, from the outset all discovery has been stayed except where necessary for Plaintiffs to respond to AT&T's Motion to Compel. Thus, if Apple had filed its Motion to Compel in 2010, the only

discovery that might have been permitted would concern the Motion to Compel. Moreover, even this limited amount of discovery would have ceased once the entire MDL was stayed in November 2010.

The only prejudice Plaintiffs can remotely point to is the fact that Plaintiffs filed an Opposition to Apple's Motions to Dismiss. (Rec. Doc. 204). However, on November 5, 2010, before Plaintiffs filed its Opposition, Apple moved to stay proceedings in light of the pending Concepcion case. (Rec. Doc. 194) Although Plaintiffs previously agreed to a stay vis-à-vis AT&T (Rec. Doc. 193), they opposed Apple's stay (Rec. Doc. 199) and subsequently filed their Opposition on November 16, 2010 (Rec. Doc. 204). The next day this Court granted Apple's request for a stay. Therefore, had Plaintiffs agreed to Apple's request for a stay, there would have been no need for Plaintiffs to file their opposition. Consequently, any prejudice claimed by the Plaintiffs in this regard was at least partially self-inflicted.

For these reasons, the Court finds Plaintiffs have not met the "heavy burden" of showing Apple has waived its argument regarding arbitration.

## C. Arbitration by Equitable Estoppel

Plaintiffs and the putative class members are signatories to AT&T's WSA, which contains an arbitration clause and class action waiver. Apple is not a signatory to the WSA. Regardless, Apple argues that, because Plaintiffs' claims against Apple are so

intertwined with the claims against AT&T, the claims against Apple also must be submitted to arbitration under an equitable estoppel theory.

"Arbitration is favored in the law." <u>Grigson v. Creative Artists Agency L.L.C.</u>, 210 F.3d 524, 526 (5th Cir. 2000) (citation omitted).  Accordingly, parties to arbitration agreements cannot avoid them by casting their claims in tort, and proceedings against signatories and nonsignatories to the arbitration agreement are stayed when the action against the nonsignatory is dependent upon interpretation of the underlying contract.  <u>Id.</u> (citations omitted).  Furthermore, the Fifth Circuit has explained that in certain limited circumstances, a nonsignatory to an arbitration agreement can require a signatory to arbitrate its claims under an equitable estoppel theory.  <u>Id</u>.  Whether to apply equitable estoppel is within the Court's discretion.  <u>Id.</u> at 528.

The <u>Grigson</u> court described two instances where equitable estoppel applies, collectively referred to as the "intertwined-claims test":

> "**First**, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory.  When each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate.  **Second,** application of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the

-14-

nonsignatory and one or more of the signatories to the contract.  Otherwise the arbitration proceedings between the two signatories would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted."

. . .

In short, although arbitration is a matter of contract and cannot, in general, be required for a matter involving an arbitration agreement non-signatory, a signatory to that agreement *cannot*, in those instances described [in the preceding paragraph], "have it both ways": it cannot, on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory. . . .

Moreover, as noted, it would be especially inequitable where, as here, a signatory non-defendant is charged with interdependent and concerted misconduct with a non-signatory defendant. In such instances, that signatory, in essence, becomes a party, with resulting loss, *inter alia*, of time and money because of its required participation in the proceeding. Concomitantly, detrimental reliance by that signatory *cannot* be denied: it and the signatory-plaintiff had agreed to arbitration in lieu of litigation (generally far more costly in terms of time and expense); but, the plaintiff is seeking to avoid that agreement by bringing the action against a non-signatory charged with acting in concert with that non-defendant signatory. Of course, detrimental reliance is one of the elements for the usual application of equitable estoppel.

Id. at 527-28 (quoting MS Dealer Serv. Corp. v. Franklin, 177 F.3d 942, 947-48 (11th Cir. 1999))(bold type added, italics in original).  Grigson also noted that equitable estoppel is more readily applicable when the case presents both bases of the intertwined-claims test.  Id.  Equitable estoppel is also more likely to apply when the party resisting arbitration is a

signatory, as is the case here, as opposed to when the resisting party is a non-signatory. See Bridas S.A.P.I.C. v. Gov't of Turkmenistan, 345 F.3d 347, 361 (5th Cir. 2003); Amisil Holdings Ltd. v. Clarium Capital Mgmt., 622 F. Supp. 2d 825, 831 (N.D. Cal. 2007) (citations omitted).

Plaintiffs contend that equitable estoppel does not apply, because their claims against Apple are separate and independently actionable from their claims against AT&T. However, this contention is contradicted by Plaintiffs' other filings in this case.

In 2010, before the stay of proceedings pending Concepcion and well-before AT&T was dismissed in 2011, Apple filed its previously-mentioned (see Part B, supra) Rule 12(b)(6) Motions to Dismiss (Rec. Docs. 120-135), to which Plaintiffs responded with their previously-mentioned opposition memorandum (hereinafter, "Plaintiffs' 2010 Opposition" or "2010 Opposition"; Rec. Doc. 204). Apple's 2010 Motions to Dismiss argued that it never mentioned MMS availability for any of its iPhones until 2009, and when it did, it stated that MMS would not become available until late summer. Plaintiffs' 2010 Opposition countered that this argument struck at only one of its three "bases of relief" against Apple:

> This case involves three bases for relief and two recovery periods. Over the entire Class Period, Plaintiffs and the class may recover for:
>
> 1) Apple's failure to disclose to iPhone purchasers—who are also captive AT&T customers—that AT&T was

contractually obligated to provide MMS to them and would
not do so; and

2) Apple's failure to disclose to iPhone purchasers—who
are also captive AT&T customers—that AT&T would charge
iPhone users for MMS but would not provide it.

[3)] For a smaller period of time, from June 2009 to
September 2009, Apple also represented the immediate
availability of MMS, even though defendants did not make
it available. Defendants failed to unambiguously or
prominently disclaim that representation.

(Pls. 2010 Opp'n, p.8, Rec. Doc. 204 at 24 (emphasis added)).

Plaintiffs further explained that the third basis of relief was

only a "small portion" of their claims. The "primary claims,"

urged Plaintiffs, were the first and second:

> Although Apple attempts to limit Plaintiffs' case to
> advertisements and a time window between June and
> September 2009, Plaintiffs' claims against Apple predate
> that time frame considerably—**and have very little to do
> with Apple's advertising**, which is just a one part of
> Plaintiffs' case that comes at the end of the class
> period. The alleged class period begins on July 11,
> 2008. Plaintiffs allege that when defendants began
> selling the 3G, **Apple and AT&T failed to disclose that
> AT&T would be <u>obligated by contract</u> to provide picture
> messaging services to iPhone users.** . . . Plaintiffs
> also allege that when defendants began selling the 3G,
> **Apple and AT&T failed to inform that <u>AT&T would actually
> charge iPhone users purchasing a messaging plan for video
> and picture messaging services</u>, despite the fact that
> they would not receive MMS services**. . . . Apple
> repeated these failures when it began selling 3GS models
> on June 19(and 3G models at a reduced price) through
> September 24, 2009. Apple provides no argument
> addressing its failure to inform its 3GS customers that
> **its exclusive partner <u>AT&T would be obligated</u> to provide
> picture and video messaging and would charge for it**,
> despite the fact that MMS would not be available on 3GS.
> **None of these allegations—<u>Plaintiffs' primary claims for
> relief</u>—are addressed by Apple's motion.**

Thus, Apple's motions rest solely upon **a small portion of Plaintiffs' claims**: statements in advertisements, public statements, and sales representatives' statements made between early Summer 2009 and September 24, 2009, solely regarding the *availability* of MMS. Thus, even if Apple were able to "disprove" the "availability" allegations [i.e., the third basis of relief] using extrinsic evidence, it would succeed only in depriving Plaintiffs of a **single legal theory and smaller recovery**. . . . Plaintiffs will defend their unavailability claim as Apple challenges it, but they urge this Court not to take Plaintiffs' defense as any kind of argument or concession that **this smaller tail should, as Apple contends, wag the dog. This case sounds in material omissions related to the obligation to provide MMS and Apple's exclusive partner, AT&T, charging iPhone users for MMS.**

(Id. at 9-10, Rec. Doc. 204 at 25-26 (bold and underscoring added, italics in original)).

By Plaintiffs' own descriptions in 2010, then, their "primary claims" against Apple were ultimately based on AT&T's alleged contractual obligation under the WSA to provide MMS, as well as the bills Plaintiffs paid under the WSA that allegedly included charges for MMS. If the WSA did not obligate AT&T to provide MMS or if AT&T did not improperly bill for MMS, then Plaintiffs' "primary claims" against Apple fail.[3] Thus, such claims meet the first basis of the intertwined-claims test, because Plaintiffs must "rely

---

[3] Also consider:

AT&T's promises and obligations concerning its general data plans are directly applicable to all iPhone customers. Apple is directly responsible for putting its customers in that position. Thus, Apple bears a responsibility to inform its customers that AT&T was going to violate its own contract with iPhone purchasers and would charge iPhone purchasers for MMS services they would not be receiving.

(Pls. 2010 Opp'n, p. 24, Rec. Doc. 204 at 40).

on the terms of the written agreement in asserting [their] claims against the nonsignatory." Grigson, 210 F.3d at 527.

Moreover, all three of Plaintiffs' claims meet the second ground of the intertwined-claims test. The Amended Complaints allege that, in order to "maximize profits," Apple and AT&T "co-marketed" the iPhone and entered into an "exclusivity agreement" that required all iPhone purchasers to obtain wireless service from AT&T. (Am. Compl. ¶¶ 2, 22, Rec. Doc. 71). The Amended Complaints further allege:

> **Defendants** [i.e., Apple **and** AT&T] did not want to lose market share by announcing this feature [i.e., MMS] would not be available and did not want to delay the lucrative launch of the new generation of 3G iPhones and thus, lose out on the extra revenue from millions of additional customers who had to lock into AT&T's exclusive contract for service. . . . **Defendants' marketing campaign** promoted the iPhone operating [on] AT&T 3G and 3GS networks by promising the latest in mobile technology capable of . . . "MMS", and much more. Despite these promises, the iPhone's MMS function was knowingly and consciously disabled while, at the same time, **Defendants advertised** that MMS was a feature included with the iPhone 3G and 3GS and AT&T's messaging service plans. . . . Plaintiff . . . relied on representations made in **Defendants' <u>uniform</u> campaign of untrue and/or misleading marketing** when choosing to purchase an iPhone 3G, 3GS and messaging plans as set forth above.

(Id. ¶¶ 5, 9, 76 (emphasis added)). Likewise, Plaintiffs' first and second bases of relief, quoted above, refer to iPhone purchasers as "captive AT&T customers." The "Factual Allegations" section of Plaintiffs' 2010 Opposition further stated:

> Defendants **Apple and AT&T worked in tandem** to promote and advertise the iPhone 3G and 3GS. Apple manufactured the iPhone and AT&T provided the only

> network upon which defendants allowed the iPhone to
> operate. **By defendants' design**, to use the Apple iPhone
> (whether purchased from Apple or AT&T), consumers were
> required to enter into a two-year service contract with
> AT&T. . . .  Included in the price of this plan was MMS
> service. But **defendants** did not provide MMS service, did
> not tell consumers they would not receive MMS service,
> and did not tell consumers that they nonetheless would be
> paying for a service that would not be made available to
> them on their iPhone.

(Pls. 2010 Opp'n, p. 2, Rec. Doc. 204 at 18 (emphasis added)).

These are allegations of substantially interdependent and concerted

misconduct by Apple and AT&T, satisfying the second basis of

applying equitable estoppel.

Notwithstanding their statements in the 2010 Opposition and

the allegations in the Amended Complaints (which remain unamended

after AT&T's dismissal), Plaintiffs now describe their claims as

follows:

> (1) Apple made affirmative misrepresentations to
> Plaintiffs regarding MMS availability on the iPhone 3G
> and 3GS;
>
> (2) Apple failed to disclose that AT&T would charge
> Plaintiffs for MMS service but would not provide it; and
>
> (3) Apple failed to disclose that AT&T's data plan
> required MMS but that service would not be provided to
> Plaintiffs.

(Pls. Opp'n to Mot. to Compel Arb. p.2, Rec. Doc. 264 at 3).

However, when Plaintiffs' latest descriptions are compared to the

three "bases of relief" provided in 2010, it is clear that

Plaintiffs have merely reversed the order of their claims and

removed language that blatantly met the intertwined-claims test

(e.g., gone are references to AT&T's "contractual[] obligation[s]" and iPhone purchasers being "captive AT&T customers"). Thus, the claim Plaintiffs listed third in 2010—and previously described as the "tail" and "small portion" of their case—now appears first. Likewise, the claims listed first and second in 2010—and previously described as their "primary claims"—now appear third and second, respectively.  To illustrate this point, Plaintiffs' current descriptions are placed alongside their 2010 analogues (in underscored text):

> (1)  Apple  made  affirmative  misrepresentations  to Plaintiffs regarding MMS availability on the iPhone 3G and 3GS;
> [3]] For a smaller period of time, from June 2009 to September 2009, Apple also represented the immediate availability of MMS, even though defendants did not make it available. Defendants failed to unambiguously or prominently disclaim that representation.
>
> (2) Apple failed to disclose that AT&T would charge Plaintiffs for MMS service but would not provide it;
> 2) Apple's failure to disclose to iPhone purchasers—who are also captive AT&T customers—that AT&T would charge iPhone users for MMS but would not provide it.
>
> (3)  Apple  failed  to  disclose  that  AT&T's  data  plan required MMS but that service would not be provided to Plaintiffs.
> 1) Apple's failure to disclose to iPhone purchasers—who are  also  captive  AT&T  customers—that  AT&T  was contractually obligated to provide MMS to them and would not do so;

Despite  this  new  packaging,  Plaintiffs'  claims  are substantively no different from the claims described in 2010. Removing explicit references to AT&T's contract obligations and allusions to interdependent and concerted misconduct does not make

the claims against Apple any less intertwined with the claims against AT&T.  See Grigson, 210 F.3d at 530-31 (affirming district court's decision to apply judicial estoppel where, after signatory defendant moved to compel arbitration under the contract on which plaintiff's claim was based, plaintiff voluntarily dismissed the entire case and subsequently refiled without naming the signatory as a defendant and without referencing the contract).[4]  As the Northern District of California recently held in a factually-similar MDL, these "cosmetic modifications" do not alter the "gravamen of their allegations."  See In re Apple iPhone 3G Prod. Liab. Lit. (iPhone 3G Prod. Liab.), No. 09-2045, 2011 WL 6019217 at *3 (N.D. Cal. Dec. 1, 2011).[5]  Therefore, Plaintiffs' "current"

---

[4]  The Grigson court further noted, though it did not hold, that the plaintiffs' inconsistent positions "bump up on, if indeed do not satisfy, the prerequisites for judicial estoppel."  Id. at 530 (citation omitted).

[5]  Although the December 1, 2011 order from iPhone 3G Prod. Liab. did not address equitable estoppel, Chief Judge Ware's analysis still informs the present issue.  That case concerns facts, claims, and procedural circumstances that are strikingly similar to the ones here.  There the plaintiffs initially pled that defendants Apple and AT&T falsely represented that the iPhone 3G would be twice as fast as the iPhone 2G, when in fact, the defendants knew that AT&T's 3G network was not sufficiently developed to accommodate the number of iPhone 3G users.  iPhone 3G Prod. Liab., 728 F. Supp. 2d 1065, 1068, 1072 (N.D. Cal. 2010).  In 2010, before Concepcion was decided, the court ruled that the plaintiffs' state-law claims against AT&T were preempted by the Federal Communications Act.  Id. at 1076.  The Court also found that the claims against Apple were preempted, because those claims were "inextricably tied" to the claims against AT&T.  Id.  The court reasoned:

   Plaintiffs' claims are based on allegations that Defendants acted together to deceive Plaintiffs despite both knowing that the iPhone 3G operating in [AT&T]'s 3G network could not perform as promised.  Although some allegations state that flaws in the iPhone 3G contributed to the poor performance experienced by Plaintiffs, the gravamen of the allegations is that any defect in the iPhone 3G merely exacerbated the poor quality of service resulting from [AT&T]'s allegedly deficient 3G network infrastructure by, for example, using more bandwidth than the network was capable of providing.  Based on the allegations, the Court finds that it is unable to reasonably separate Plaintiffs' claims to pertain only to

claims meet the test for equitable estoppel, just as they would have in 2010.  _Accord In re Apple & AT&TM Antitrust Litig._, ___ F. Supp. 2d. ___, 2011 WL 6018401 at *5-7(N.D. Cal. Dec. 1, 2011).[6]

Plaintiffs cite _Weingarten Realty Investors v. Miller_, 661 F.3d 904 (5th Cir. 2011), to support their argument that equitable

---

Defendant Apple. Thus, the Court finds that the claims are preempted as to both Defendants.

_Id._ (citations omitted).  The court also found that under Federal Rule 19, the case against Apple could not proceed without AT&T, "because any adjudication of claims as to Defendant Apple would necessarily require a determination of the sufficiency of [AT&T]'s 3G network infrastructure. . . . [and would largely] require participation by [AT&T]."  _Id._

After this ruling, the plaintiffs amended the master complaint to assert federal claims against both Apple and AT&T.  Then, after _Concepcion_ was rendered the plaintiffs dismissed AT&T (similar to what occurred here) and amended their master complaint to delete reference to AT&T.  _iPhone 3G Prod. Liab._, No. 09-2045, 2011 WL 6019217 (N.D. Cal. Dec. 1, 2011).  Apple responded as it did here: moving to dismiss under Rule 12(b)(7).  In determining (for a second time) that AT&T was a "necessary party" under Rule 19(a), the court explained that "Plaintiffs have simply deleted references to [AT&T] that appeared in their previous Complaint without altering the gravamen of their allegations." _Id._ at *3.  "These cosmetic modifications are unavailing . . . as the Court has already held that [AT&T] is an 'indispensable party' . . . ."  _Id._

Given the similarity between the claims in _iPhone 3G Prod. Liab._ and this MDL, Chief Judge Ware's conclusion that the claims against Apple were "inextricably tied" to the claims against AT&T for preemption purposes, bolsters this Court's conclusion that the instant claims similarly meet the intertwined-claims test for arbitration-by-estoppel purposes.  Likewise, Chief Judge Ware's conclusion on the Rule 12(b)(7)/Rule 19 issue supports the conclusion that AT&T would be a necessary party, mootness issues notwithstanding.

[6] _In re Apple & AT&TM Antitrust Litigation_ is another case before Chief Judge Ware that is similar in many respects to this MDL.  _See also iPhone 3G Prod. Liab._, _supra_, note 5.  There the plaintiffs alleged that Apple and AT&T's "exclusivity agreement" violated the Sherman Antitrust Act, because it effectively forced iPhone purchasers to contract with AT&T for wireless services beyond the two year term in the WSA.  Just as it did here, Apple sought to compel the plaintiffs to arbitration based on the arbitration clause found in AT&T's WSA.  Applying the Ninth Circuit's test for equitable estoppel (which requires showing that (1) the claims against the nonsignatory are intertwined with the contract and (2) there is a relationship among the parties that justifies estopping the plaintiff signatory), the court found that estoppel applied because (1) plaintiffs contended throughout the litigation that their claims against both Apple and AT&T arose from AT&T's contract (as is the case here) and (2) plaintiffs' claim against Apple centered on the alleged secret agreement between Apple and AT&T (also the case here).

estoppel is not appropriate. However, <u>Weingarten</u> is distinguishable. <u>Weingarten</u> concerned two contracts, a loan agreement (which contained an arbitration clause) and a guarantee (which did not contain arbitration clause). When the borrower defaulted on the loan, the lender sued the guarantor, who was not a party to the loan agreement/arbitration clause. The district court rejected the guarantor's equitable estoppel argument, which the court of appeals affirmed. The court reasoned that the guarantor's obligation to pay did not require separate evaluation of the loan agreement, because it was undisputed that the loan was in default. The guarantor was merely asked to pay as he contracted to do guarantee. <u>See id.</u> at 912.

Admittedly, here it is not disputed that MMS was unavailable until September 25, 2009. However, if AT&T was still a party to this litigation, it could be reasonably presumed that it **would** dispute the claims that it was contractually obligated to provide MMS and that it improperly charged for MMS. Thus, this matter is unlike <u>Weingarten</u>, because the two "primary claims" (per Plaintiffs' 2010 Opposition) against Apple would require the Court to evaluate and interpret AT&T's WSA and billing statements. To the extent that Plaintiffs' third claim (regarding Apple's alleged misrepresentations about availability MMS) does not require interpreting AT&T's contract, equitable estoppel is still appropriate under the "interdependent and concerted misconduct"

basis, as discussed above.  Furthermore, considering Plaintiffs'
earlier description of this claim as the "tail" of their case, it
should not, to borrow Plaintiffs' expression, wag the dog now.[7]

Plaintiffs also argue that equitable estoppel should not apply
because two of Apple's contracts with Plaintiffs—the iPhone
Software License and the iTunes Terms of Service—do not contain
arbitration clauses.  However, Plaintiffs' claims are not based on
breaches of these contracts.  Indeed, there is no reference to
these contracts in Plaintiffs' Amended Complaints.  (See Rec. Doc.
71).  These contracts are irrelevant to this dispute and the
instant question.  Accord In re Apple & AT&TM Antitrust Litig., No.
07-5125, 2012 WL 293703 at *3-4 (N.D. Cal. Feb. 1, 2012).

Finally, in addition to arguing that their claims do not
satisfy Grigson's intertwined-claims test, Plaintiffs also argue
that after the Supreme Court's decision in Arthur Andersen LLP v.
Carlisle, 556 U.S. 624 (2009), California law governs the equitable
estoppel question.  (Pls. Opp'n to Mot. to Compel, pp. 18-21, Rec.
Doc. 264 at 19-22).  Plaintiffs contend that several California
courts apply a traditional common law test for equitable estoppel,
rather than the intertwined-claims test developed in federal

---

[7] For similar reasons, Westmoreland v. Sadoux, 299 F.3d 462 (5th Cir.
2002), is also inapposite.  There the court did not apply equitable estoppel
because "Westmoreland's suit does not rely upon the terms of the shareholder
agreement or seek to enforce any duty created by the agreement, and there is no
allegation that Sadoux acted in concert with anyone."  Id. at 467.  As explained
above, here Plaintiffs' allegations must, in large part, rely on the terms of the
WSA, and allegations of substantial interdependent and concerted misconduct
between Apple and AT&T underscore all claims.

jurisprudence.   However, Plaintiffs' argument is based on the choice-of-law provision contained in the two Apple contracts referenced above.   As just discussed, these contracts are irrelevant to Plaintiffs' claims and the instant issue, and therefore provide no basis for applying California law.

In any respect, the Fifth Circuit has yet to determine what effect, if any, <u>Carlisle</u> had on <u>Grigson</u> and the intertwined-claims test. <u>See DK Joint Venture 1 v. Weyand</u>, 649 F.3d 310, 314 (5th Cir. 2011) (declining to decide whether federal or state law governed equitable estoppel in the arbitration context when there was no conflict between Texas law and federal law).   Another district court noted that it is somewhat unclear whether or to what extent <u>Carlisle</u> requires the application of state law. <u>See Kingsley Capital Mgmt., LLC v. Sly</u>, __ F. Supp. 2d __, 2011 WL 5008520 at *9 (D. Ariz. Sept. 30, 2011).[8]   Assuming, however, that <u>Carlisle</u> requires California law to apply in lieu of federal law, it is not clear whether California law is substantively different from federal law, or, in any respect, would provide a different result in this case.   Plaintiffs concede that California courts are "split as to the legal standard for applying equitable estoppel" (Pls. Opp'n to Mot. to Compel, pp.19-20, Rec. Doc. 264 at 20-21), with

---

[8] <u>Kingsley</u> did note that the Eleventh Circuit has interpreted <u>Carlisle</u> as abrogating its earlier decisions to the extent they did not apply state law to the arbitration-by-estoppel issue. <u>Id.</u> at *8.   However, <u>Kingsley</u> also pointed out that several district courts have continued to use the federal standard to determine this issue. <u>Id.</u> at *8 n.5.

some applying the traditional common law test and some applying federal law.  In fact, and as noted above, the Northern District of California recently found equitable estoppel to apply in a similar case.  See note 6, supra.  Thus, this Court will not deviate from the intertwined-claims test, given that (1) the Apple contracts are irrelevant, (2) it is not clear that California law is different from federal law, and (3) the Fifth Circuit has not held that federal law does not apply to this issue.

It is also important to recognize that Grigson's intertwined-claims test incorporates a detrimental reliance element (albeit the detrimental reliance of the signatory non-defendant, AT&T), which is "one of the elements for the usual application of [i.e., the traditional common-law approach to] equitable estoppel."  210 F.3d at 528.  Thus, even if a State's law applied to this matter and even if such law applied the traditional common law test, it is questionable whether the traditional common law test for equitable estoppel is substantively different from the federal law test. Grigson explained that "detrimental reliance by that signatory [i.e., AT&T] cannot be denied: it and the signatory-plaintiff had agreed to arbitration in lieu of litigation (generally far more costly in terms of time and expense)."  Id.  Thus, where claims against the nonsignatory (i.e., Apple) require the signatory non-defendant (i.e., AT&T) to, "in essence, become[] a party, with resulting loss, inter alia, of time and money because of its

-27-

required participation in the proceeding," a plaintiff may not avoid the arbitration agreement.  Id.  Additionally, requiring the signatory non-defendant's participation would run afoul of the "liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary," as well as "ensur[ing] that private arbitration agreements are enforced according to their terms." Concepcion, 131 S. Ct. at 1748-49 (citations and internal quotations omitted).  As explained above, AT&T's participation would be required in this case, as Plaintiffs' "primary claims" against Apple require determining AT&T's obligations and performance under its contract and Plaintiffs allege interdependent and concerted misconduct.

For the reasons explained above, the Court finds that the arbitration clause in AT&T's WSA applies to Plaintiffs' claims against Apple as well.  Because all of the issues in this MDL must be arbitrated, there is no reason to retain jurisdiction; the Court will dismiss the case without prejudice.  See Alford v. Dean Witter Reynolds, Inc., 975 F.2d 1161, 1164 (5th Cir. 1992); Westlake Styrene Corp. v. P.M.I. Trading, Ltd., 71 F. App'x 442 (5th Cir. 2003)(unpublished decision).[9]

---

[9] Alternatively, if the Court did not find that Plaintiffs' claims must be arbitrated, it would hold that the case against Apple must be stayed pending arbitration against AT&T.  Grigson, 210 F.3d at 526.

### III.   CONCLUSION

**IT IS ORDERED** that Apple's Motion to Compel Arbitration (Rec. Doc. 235) is hereby **GRANTED**. Plaintiffs' claims against Apple must be submitted to arbitration, pursuant to the terms of AT&T's WSA.

**IT IS FURTHER ORDERED** that all member cases consolidated within this MDL are **DISMISSED WITHOUT PREJUDICE.**

**IT IS FURTHER ORDERED** that Apple's Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(7) (Rec. Doc. 268) is **DENIED AS MOOT**.

Signed in New Orleans, Louisiana, this 29th day of March, 2012.

_____
United States District Judge

-29-